STATE OF CONNECTICUT *v.* TADEO POLANCO
(AC 21251)

Schaller, Bishop and Shea, Js.

---

170

Argued January 18—officially released April 16, 2002

*Norman A. Pattis,* for the appellant (defendant).

*Mitchell S. Brody,* senior assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Patrick J. Griffin,* assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. In this case, which is the companion to *State* v. *Diaz*, 69 Conn. App. 187, 793 A.2d 1204 (2002), Tadeo Polanco, one of two codefendants, appeals from the judgment of conviction, rendered after a jury trial, of possession of cocaine with intent to sell in violation of General Statutes § 21a-278 (a),[1] possession of cocaine with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b)[2] and interfering with a search in violation of General Statutes § 54-33d.[3]

[1] General Statutes § 21a-278 (a) provides in relevant part: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person one or more preparations, compounds, mixtures or substances containing an aggregate weight of one ounce or more of heroin, methadone or cocaine or an aggregate weight of one-half gram or more of cocaine in a free-base form or a substance containing five milligrams or more of lysergic acid diethylamide, except as authorized in this chapter, and who is not, at the time of such action, a drug-dependent person, shall be imprisoned for a minimum term of not less than five years nor more than twenty years; and, a maximum term of life imprisonment. . . ."

[2] General Statutes § 21a-278a (b) provides in relevant part: "Any person who violates section 21a-277 or 21a-278 by manufacturing, distributing, selling, prescribing, dispensing, compounding, transporting with the intent to sell or dispense, possessing with the intent to sell or dispense, offering, giving or administering to another person any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278. To constitute a violation of this subsection, an act of transporting or possessing a controlled substance shall be with intent to sell or dispense in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place. . . ."

[3] General Statutes § 54-33d provides: "Any person who forcibly assaults, resists, opposes, impedes, intimidates or interferes with any person authorized to serve or execute search warrants or to make searches and seizures while engaged in the performance of his duties with regard thereto or on

On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction of the cocaine charges and, therefore, the court improperly denied his motion for a judgment of acquittal, and (2) the court improperly admitted into evidence a computer generated map showing that the location where he and the cocaine had been seized was within 1500 feet of a school. We affirm the judgment of the trial court.

On March 29, 2000, the state charged the defendant, by substitute information, as follows: count one, possession of cocaine with intent to sell in violation of § 21a-278 (a); count two, possession of cocaine with intent to sell in violation of § 21a-278 (a); count three, possession of cocaine with intent to sell within 1500 feet of a school in violation of § 21a-278a (b); count four, possession of cocaine with intent to sell within 1500 feet of a school in violation of § 21a-278a (b); and count five, interfering with a search in violation of § 54-33d. The defendant entered a plea of not guilty to each of the five charges and elected a jury trial.

On the basis of the evidence admitted during the defendant's trial, the jury reasonably could have found the facts that follow. On June 4, 1999, at approximately noon, Robert Cizauskas and Stephen Hunt, officers in the Waterbury police department, traveled in an unmarked police vehicle to the vicinity of 133 Hillside Avenue, Waterbury. Upon arriving, Cizauskas and Hunt began conducting "preraid surveillance" in preparation for the execution of a search warrant, the scope of which included 133 Hillside Avenue, apartment 2A. At approximately 12:45 p.m., the officers saw the defendant and his codefendant, Herman Diaz, exit the build-

account of the performance of such duties, shall be fined not more than one thousand dollars or imprisoned not more than one year or both; and any person who in committing any violation of this section uses any deadly or dangerous weapon shall be fined not more than ten thousand dollars or imprisoned not more than ten years or both."

ing. The defendant was carrying a black plastic bag, and Diaz was carrying a light colored plastic bag. The two men walked across the street and entered a parked, tan Oldsmobile. A few minutes later, the defendant and Diaz exited the Oldsmobile, crossed the street and returned to the building. Neither was carrying either of the plastic bags.

Fifteen minutes later, the Waterbury police officers who had been assigned to execute the warrant arrived at the scene. Two of them, Lawrence Smith and Robert Jones, entered the building and located apartment 2A. Smith knocked on the front door and announced, "Police with search warrant." Smith and Jones both heard noises and voices emanating from the apartment, but no one answered the door. Smith knocked and announced his presence again, but still no one answered. Finally, Jones, using force, gained entry to the apartment.

Immediately upon entering the apartment, Jones saw the defendant running directly at him and heard him yelling, "Policia, policia!" The defendant collided with Jones and grabbed Jones' vest. Both fell to the floor and began wrestling. Moments later, Jones subdued and handcuffed the defendant. Smith, who had begun conducting a protective sweep of the apartment, saw Diaz running from the front bedroom. Smith detained him. No one else was found in the apartment.

The police then searched the apartment, which was sparsely furnished and contained few personal belongings. In the front bedroom, Jones removed one of the ceiling panels, revealing eight plastic bags wrapped in paper towels. Each plastic bag contained crack cocaine.[4] While searching the closet in the middle bedroom, Smith discovered $580 in the pocket of a coat.

---

[4] The total weight of the crack cocaine was 221.6 grams, and it had a street value of $8000.

Timothy Kluntz, a Waterbury police detective, searched the kitchen. There, he discovered a metal pot containing cocaine residue and several other items commonly associated with the production of crack cocaine, including a box of plastic bags, two opened boxes of baking soda, paper towels and a strainer. In a cluster on the kitchen counter, Kluntz found Diaz's social security card, Diaz's alien registration card and a sheet of paper listing certain drug sales.

The officers then searched the defendant and Diaz. On each of them, the officers found a key that fit the door to the apartment. The officers did not find any items commonly associated with the use of cocaine in the apartment or on the person of either the defendant or Diaz. Afterward, the officers transported the defendant and Diaz to the police station.

The state brought counts two and four against the defendant in response to the crack cocaine that the police had discovered in the ceiling of the apartment. The state brought the first and third counts against the defendant in response to allegations by the police that they later discovered crack and powder cocaine in the tan Oldsmobile parked across the street from the apartment. The fifth count was brought in response to the collision and scuffle that the defendant had caused with Jones.

On April 12, 2000, the jury returned a verdict of guilty as to counts two, four and five, but remained deadlocked on counts one and three. The court declared a mistrial on counts one and three, accepted the verdict on counts two, four and five, and rendered judgment accordingly. The defendant later was sentenced to a total effective term of twenty-four years imprisonment. This appeal followed. Additional facts and procedural history will be presented as necessary.

## I

The defendant claims that the evidence was insufficient to support his conviction on the cocaine charges and, therefore, the court improperly denied his motion for a judgment of acquittal. Specifically, the defendant argues that the evidence was insufficient to support a finding that he had possessed the crack cocaine that was seized from the apartment. In furtherance of that argument, the defendant claims that the evidence provides greater support for the conclusion that Diaz exclusively possessed the apartment and the cocaine, and that the defendant was an innocent, confused bystander.

"In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal

quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 224–25, 733 A.2d 156 (1999).

"In order to prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it. . . . Where, as here, the cocaine was not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. . . . One factor that may be considered in determining whether a defendant is in constructive possession of narcotics is whether he is in possession of the premises where the narcotics are found. . . . Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference." (Citations omitted; internal quotation marks omitted.) Id., 225.

In the present case, the state did not claim that the defendant was in exclusive possession of the apartment where the crack cocaine was found. Consequently, the jury could not have reasonably concluded that the defendant had constructively possessed the crack cocaine, namely, that he had known of its presence and had control over it, "unless there [were] other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) Id. We conclude that there were other incriminating circumstances from which the jury reasonably could have concluded that the defendant had constructively possessed the cocaine.

During the trial, the state called Domingo Toro, the superintendent of the apartment building, as a witness.

Toro testified as follows. In the month preceding the raid, Diaz leased the apartment and paid $800 for rent and a security deposit. After Diaz moved in, Toro visited Diaz in the apartment and saw that it still was unfurnished except for a little table and a television. Thereafter, he lent Diaz a couch and later observed the defendant help Diaz move that couch into the apartment. Afterward, Diaz informed him that he and the defendant were friends and that the defendant, too, would be living in the apartment. The state also called Kluntz and Cizauskas. Kluntz testified that while searching the defendant, he found and seized a key from the defendant's person, and that key fit the door to the apartment. Cizauskas testified as follows. While surveilling the apartment in preparation for the search, he saw the defendant and Diaz leave the apartment and return to it. Furthermore, the state presented police testimony indicating that the apartment contained two mattresses, one in each bedroom. When the foregoing evidence is construed in the light most favorable to sustaining the verdict, it establishes that the defendant shared possession of the apartment with Diaz.

The state presented the following evidence linking the defendant to the crack cocaine found in the apartment. Prior to gaining entry into the apartment, Smith knocked and announced twice, each time yelling, "Police with a search warrant!" Jones heard noises and voices emanating from the apartment, but no one answered the door. After gaining entry by using force, Jones immediately saw the defendant running directly at him and heard him yelling, "Policia, policia!" The defendant collided with him and grabbed his vest.

After securing the apartment, the police searched it thoroughly. No one other than the defendant and Diaz were found in the apartment, which was sparsely furnished and contained few personal belongings. On the kitchen counter, Kluntz found and seized plastic bags,

open boxes of baking soda, paper towels, a strainer, a sheet of paper listing drug sales and a metal pot containing cocaine residue. In the ceiling of the front bedroom, Jones discovered $8000 worth of crack cocaine packaged in eight plastic bags, which, in turn, were wrapped in paper towels. While searching the closet in the middle bedroom, Smith discovered $580 in the pocket of a coat. To access either of the bedrooms, one first had to pass through the kitchen. Michael Gugliotti, a sergeant in the Waterbury police department, testified that the items found on the kitchen counter were "consistent with an individual that would convert a powder cocaine into crack cocaine."

When the foregoing evidence is construed in the light most favorable to sustaining the verdict, it supports the following factual findings. The apartment primarily was used to produce and store crack cocaine. Powder cocaine was converted to crack cocaine in the kitchen, and that crack cocaine then was stored in the ceiling of the front bedroom. The proceeds from the sales of the crack cocaine generally were kept in a coat, which was stored in the closet of the middle bedroom. When the defendant yelled, "Policia, policia," and charged at Jones, he was attempting to prevent him and other police officers from searching the apartment.

Those findings establish the existence of additional incriminating circumstances that buttress an inference that the defendant knew of, and had control over, the crack cocaine. The evidence was adequate to support a finding that the defendant had constructively possessed the crack cocaine. Thus, we conclude that the evidence was sufficient to support his conviction on the cocaine charges and that the court properly denied the defendant's motion for a judgment of acquittal.

II

Next, the defendant claims that the court improperly admitted into evidence a computer generated map showing that the distance between the apartment at

133 Hillside Avenue and the nearest school was less than 1500 feet. Specifically, the defendant argues that the court improperly admitted the map under the business records exception to the hearsay rule because (1) the sole witness through whom the state had attempted to lay an adequate foundation (a) did not prepare the map and (b) lacked sufficient knowledge concerning the technology that had been used to generate the map, and (2) the state had failed to establish that the technology that had been used, namely, a global positioning satellite system, an aerial photography system and a computer program, was reliable.[5] We disagree.

The following additional procedural history is relevant to our resolution of the defendant's claims. During its case-in-chief, the state offered, as a full exhibit, a computer generated map showing that the distance between the apartment at 133 Hillside Avenue and the nearest school was less than 1500 feet. Recognizing that the map was hearsay, the state requested that the court admit the map pursuant to either the business records or public records exception to the hearsay rule. The defendant and Diaz each raised several objections in response. The following objections were raised: (1) the requirements for admission under the business records exception had not been satisfied; (2) the state had not laid an adequate foundation "as to the accuracy of the map and where the information on the map comes

---

[5] On the basis of those same two assertions, the defendant argues that the map was not otherwise admissible under the public records exception to the hearsay rule. Also, we note that the defendant, during oral argument, raised the following additional claim. An exhibit that is based, at least in part, on information obtained from a person who is not a public official is inadmissible under the public records exception to the hearsay rule, and, therefore, the computer generated map is not admissible under that exception to the hearsay rule.

In light of our resolution of the defendant's claim under the business records exception, we need not address his claim premised on the public records exception to the hearsay rule.

from"; (3) during its offer of proof, the state failed to establish that the technology that had been used to generate the map was reliable; and (4) the map had been prepared by the city of Waterbury for purposes of litigation and, therefore, could not be admitted under the public records exception.

The court overruled those objections and admitted the map into evidence under the business records exception to the hearsay rule. In so doing, the court stated: "[T]his map is being offered by the state for the sole purpose of presenting evidence to support the state's contention that 133 Hillside Avenue, apartment 2A, is within 1500 feet of a school district, in particular to the Driggs School. This exhibit is admitted solely for that purpose."

The record discloses that the state, during its offer of proof, presented evidence in response to the objections raised by the defendant and Diaz. Specifically, the state called Steven Santovasi, a geographic information systems technician, as a witness. Santovasi testified as follows. He was employed by the city of Waterbury bureau of engineering for sixteen years. His daily responsibilities included maintaining maps of Waterbury for use by various municipal departments and administering a system "that contain[ed] the locations of everything within the city." In response to a request by the office of the state's attorney, he prepared a map of Waterbury for the present case showing Driggs School, a radius of 1500 feet around that school and 133 Hillside Avenue. He identified state's exhibit eighteen as the map he had produced pursuant to that request, and stated that it fairly and accurately represented the area as it appeared on June 4, 1999, and that he had prepared it approximately one month before trial in the regular course of his business.

Santovasi generated the map using the computer system he administered. He did not simply "print it out."

Due to Waterbury's large area, the computerized map consists of 799 small maps (grids) that are stored in a digital library. Those grids can be assembled in various ways. Santovasi assembled state's exhibit eighteen using several contiguous grids that corresponded to the area in which the state had expressed interest. After assembling the grids, he "created a circle 1500 feet around the center point of the school." He blackened the school and generated a rectangle around 133 Hillside Avenue. The map merely shows a relative distance, as it does not indicate the specific distance between Driggs School and 133 Hillside Avenue. The map was generated using data relied on by Waterbury for utility information, zone information and soil information.

The underlying system that was used to produce the map included control points that had been established throughout Waterbury, the location of which had been identified accurately through the use of global positioning satellites. Aerial photographs were then taken and a method known as triangulation was used.

We now set forth the legal principles that govern our analysis of the defendant's claim that the map failed to qualify for admission under the business records exception.

"A trial court's ruling on the admissibility of evidence is entitled to great deference and will be overturned only if a clear abuse of the court's discretion is shown and the defendant shows that the ruling caused substantial prejudice or injustice." *State* v. *Lewis*, 245 Conn. 779, 804 n.23, 717 A.2d 1140 (1998). An appellate tribunal is required to make every reasonable presumption in favor of upholding the trial court's ruling. Id., citing *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998).

"To be admissible under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions

set forth in . . . [General Statutes] § 52-180.[6] The court must determine, before concluding that it is admissible, that the record was made in the regular course of business, that it was the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter.[7] . . . In applying the business records exception, the statute [§ 52-180] should be liberally interpreted. . . . In part, this is because the statute recognizes the inherent trustworthiness of documents created for business rather than litigation purposes."[8] (Citation omitted; internal quotation marks omitted.) *Calcano* v. *Calcano*, 257 Conn. 230, 240–41, 777 A.2d 633 (2001); see also Conn. Code Evid. § 8-4.

---

[6] General Statutes § 52-180 provides in relevant part: "(a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.

"(b) The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility."

[7] We note that a "question as to the timeliness of the creation of [a computer] record is answered by observing that the time requirement refers to when the entry into the data bank was originally made, not the time the printout was produced." 2 C. McCormick, Evidence (5th Ed. 1999) § 294, p. 269.

[8] We recognize, however, that "[w]ith regard to documents prepared for use in litigation, the arrangement of the data in a form designed to aid litigation should not result in exclusion if the data and the retrieval process *are themselves reliable*." (Emphasis added.) 2 C. McCormick, Evidence (5th Ed. 1999) § 294, p. 269; see also *Jefferson Garden Associates* v. *Greene*, 202 Conn. 128, 140–41, 520 A.2d 173 (1987) (even document prepared for litigation may be admitted under General Statutes § 52-180 provided it bears circumstantial indicia of trustworthiness).

"Once these criteria have been met by the party seeking to introduce the record, however, it does not necessarily follow that the record itself is generally admissible, nor does it mean that everything in it is required to be admitted into evidence. . . . [T]he information contained in the report must be based on the entrant's own observation or on information of others whose business duty it was to transmit it to the entrant. . . . If the information does not have such a basis, it adds another level of hearsay to the report which necessitates a separate exception to the hearsay rule in order to justify its admission." (Internal quotation marks omitted.) *State* v. *Berger*, supra, 249 Conn. 231; see Conn. Code Evid. § 8-4 commentary. That requirement aids in ensuring that exhibits admitted under the business records exception satisfy a minimum threshold of reliability. See *American Oil Co.* v. *Valenti*, 179 Conn. 349, 358, 426 A.2d 305 (1979). Nevertheless, an exhibit admitted under the business records exception is not presumed to be accurate, and its credibility remains a question for the trier of fact. See id.

In the present case, two of the three arguments advanced by the defendant on appeal actually relate more directly to the legal principles that control the admissibility of computer generated exhibits. The defendant challenges the admission of the computer generated map on three grounds: (1) the witness, Santovasi, did not prepare the map himself, (2) Santovasi lacked sufficient knowledge concerning the technology that had been used to generate the map and (3) the state failed to establish that the technology that had been used was reliable. The second and third grounds implicate the manner in which our courts are confronting the increased prevalence of computer generated exhibits in the courtroom. Cf. id., 357–61; *Federal Deposit Ins. Corp.* v. *Carabetta*, 55 Conn. App. 369, 376,

739 A.2d 301, cert. denied, 251 Conn. 927, 742 A.2d 362 (1999).

Computer generated exhibits present "structural questions of reliability that transcend the reliability of the underlying information that is entered into the computer." *American Oil Co.* v. *Valenti*, supra, 179 Conn. 358. To accommodate that heightened concern, a court is not permitted to admit a computer generated exhibit into evidence unless the proffering party also (1) presents a witness whose knowledge of computers is sufficient to enable direct and cross-examination concerning the process used to generate the exhibit and (2) lays a foundation, through that witness, sufficient to support a finding that the process and equipment involved in generating the exhibit were adequate for that purpose. See id., 359–60; *Federal Deposit Ins. Corp.* v. *Carabetta*, supra, 55 Conn. App. 376 (in addition to satisfying requirements of business records exception, party proffering computer record must establish that basic elements of computer system are reliable). With that two part test in mind also, we now address the defendant's claims.

## A

The defendant first claims that Santovasi did not prepare the map himself. To the contrary, the evidence indicates that he, in fact, generated the map using data maintained by the city of Waterbury in its computers. In *River Dock & Pile, Inc.* v. *O & G Industries, Inc.*, 219 Conn. 787, 794, 595 A.2d 839 (1991), our Supreme Court stated: "The witness whose testimony provides the foundation for the admission of a business record must testify to the three statutory requirements, but it is not necessary that the record sought to be admitted was made by that witness or even that the witness have been employed by the business at the time the record was made." Thus, Santovasi did not even have to pre-

pare the map to be eligible to provide the foundation for its admission into evidence under the business records exception. See also General Statutes § 52-180 (b); Conn. Code Evid. § 8-4.

## B

The defendant next argues that Santovasi, the sole witness through whom the state had attempted to lay a proper foundation, lacked sufficient knowledge concerning the technology that had been used to generate the map.

In addressing a similar challenge, our Supreme Court provided the following additional guidance for use when considering whether a witness had sufficient knowledge of computers to be capable of affording a threshold degree of reliability to an exhibit that had been computer generated: "What is crucial is not the witness' job description but rather his knowledgeability about the basic elements that afford reliability to computer printouts. . . . The witness must be a person who is familiar with computerized records not only as a user but also as someone with some working acquaintance with the methods by which such records are made." (Citation omitted.) *American Oil Co.* v. *Valenti,* supra, 179 Conn. 360–61.

The record in the present case discloses that Santovasi was thoroughly familiar with computer generated maps and had considerable working knowledge of the methods used to generate them. Santovasi also was well acquainted with the technology involved in collecting and compiling the data a computer uses when generating a map. He therefore had knowledge sufficient to allow for meaningful direct and cross-examination concerning computer generated maps. For the foregoing reasons, we conclude that Santovasi was capable of affording a threshold degree of reliability to the map

and, accordingly, reject the defendant's claim to the contrary.

## C

Finally, the defendant argues that the state, in attempting to lay a proper foundation, failed to establish that the technology that had been used to generate the map, namely, a global positioning satellite system, an aerial photography system and a computer program, was reliable.

The record discloses that Santovasi testified that the map fairly and accurately depicted the section of Waterbury at issue as that section had appeared on June 4, 1999. Santovasi testified also that the control points on which the city's computer system relied had been identified accurately through the use of global positioning satellites. That testimony, together with Santovasi's detailed description of the city's computer system, which he himself administered, gave rise to an inference that the hardware and software used to generate the map were not only adequate for that purpose but also had been designed for that purpose. Thus, through Santovasi, the state succeeded in laying a foundation sufficient to support a finding that the process and equipment involved in generating the map were adequate for that purpose. More specific testimony concerning the underlying technology was unnecessary, and any remaining doubt as to the reliability of that technology went to the weight to be given the map, not its admissibility. Therefore, we conclude that the court did not abuse its discretion in admitting the map into evidence.

The judgment is affirmed.

In this opinion the other judges concurred.