## STATE OF CONNECTICUT *v.* HERMAN DIAZ
## (AC 21332)

Schaller, Bishop and Shea, Js.

Argued January 11—officially released April 16, 2002

*Brian D. Russell,* special public defender, for the appellant (defendant).

*Ronald G. Weller,* assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Patrick J. Griffin,* assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. In this case, which is the companion to *State* v. *Polanco*, 69 Conn. App. 169, 797 A.2d 523 (2002), Herman Diaz, one of two codefendants, appeals from the judgment of conviction, rendered after a jury trial, of possession of cocaine with intent to sell in violation of General Statutes § 21a-278 (a)[1] and possession of cocaine with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b).[2] On appeal, the defendant claims that (1) the evidence was insufficient to support his conviction and, therefore, the court improperly denied his motion for a judgment

[1] General Statutes § 21a-278 (a) provides in relevant part: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person one or more preparations, compounds, mixtures or substances containing an aggregate weight of one ounce or more of heroin, methadone or cocaine or an aggregate weight of one-half gram or more of cocaine in a free-base form or a substance containing five milligrams or more of lysergic acid diethylamide, except as authorized in this chapter, and who is not, at the time of such action, a drug-dependent person, shall be imprisoned for a minimum term of not less than five years nor more than twenty years; and, a maximum term of life imprisonment. . . ."

[2] General Statutes § 21a-278a (b) provides in relevant part: "Any person who violates section 21a-277 or 21a-278 by manufacturing, distributing, selling, prescribing, dispensing, compounding, transporting with the intent to sell or dispense, possessing with the intent to sell or dispense, offering, giving or administering to another person any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278. To constitute a violation of this subsection, an act of transporting or possessing a controlled substance shall be with intent to sell or dispense in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place. . . ."

of acquittal and (2) the court improperly denied his motion to sever his trial from that of his codefendant, Tadeo Polanco. We affirm the judgment of the trial court.

On March 29, 2000, the state charged the defendant, by substitute information, as follows: count one, possession of cocaine with intent to sell in violation of § 21a-278 (a); count two, possession of cocaine with intent to sell in violation of § 21a-278 (a); count three, possession of cocaine with intent to sell within 1500 feet of a school in violation of § 21a-278a (b); count four, possession of cocaine with intent to sell within 1500 feet of a school in violation of § 21a-278a (b). The defendant entered a plea of not guilty to each of the four charges and elected a jury trial.

On the basis of the evidence admitted during the defendant's trial, the jury reasonably could have found the facts that follow. On June 4, 1999, at approximately noon, Robert Cizauskas and Stephen Hunt, officers in the Waterbury police department, traveled in an unmarked police vehicle to the vicinity of 133 Hillside Avenue, Waterbury. Upon arriving, Cizauskas and Hunt began conducting "preraid surveillance" in preparation for the execution of a search warrant, the scope of which included 133 Hillside Avenue, apartment 2A. At approximately 12:45 p.m., the officers saw the defendant and Polanco exit the building. The defendant, who was shirtless, was carrying a light colored plastic bag, and Polanco was carrying a black plastic bag. The two men walked across the street and entered a parked, tan Oldsmobile. A few minutes later, the defendant and Polanco exited the Oldsmobile, crossed the street and returned to the building. Neither was carrying either of the plastic bags.

Fifteen minutes later, the Waterbury police officers who had been assigned to execute the warrant arrived

at the scene. Two of them, Lawrence Smith and Robert Jones, entered the building and located apartment 2A. Smith knocked on the front door and announced, "Police with search warrant." Smith and Jones both heard noises and voices emanating from the defendant's apartment, but no one answered the door. Smith knocked and announced his presence again, but still no one answered. Finally, Jones, using force, gained entry to the apartment.

Immediately upon entering the apartment, Jones saw Polanco running directly at him and heard him yelling, "Policia, policia!" Polanco collided with Jones, and both fell to the floor and began wrestling. Moments later, Jones subdued and handcuffed Polanco. Smith, who since had begun conducting a protective sweep of the apartment, saw the defendant, who was shoeless and still shirtless, running from the front bedroom. Smith detained the defendant. No one else was found in the apartment.

The police then searched the apartment. In the front bedroom, Jones removed one of the ceiling panels, revealing eight plastic bags wrapped in paper towels. Each plastic bag contained crack cocaine.[3] While searching the closet in the middle bedroom, Smith discovered $580 in the pocket of a coat. Timothy Kluntz, a Waterbury police detective, searched the kitchen. There, he discovered a metal pot containing cocaine residue and several other items commonly associated with the production of crack cocaine, including a box of plastic bags, two opened boxes of baking soda, paper towels and a strainer. In a cluster on the kitchen counter, Kluntz found the defendant's social security card, the defendant's alien registration card and a sheet of paper listing certain drug sales.

---

[3] The total weight of the crack cocaine was 221.6 grams, and it had a street value of $8000.

The officers then searched the defendant and Polanco. On each of them, the officers found a key that fit the door to the apartment. The officers did not find any items commonly associated with the use of cocaine in the apartment or on the person of either the defendant or Polanco. Afterward, when it was time for the officers to transport the defendant and Polanco to the police station, an officer asked the defendant, who still was shoeless and shirtless, where his clothes were. The defendant replied that his clothes were in the front bedroom, which he identified as his room. The officers permitted the defendant to retrieve a shirt and a pair of shoes from the front bedroom, and transported him and Polanco to the station.

The state brought counts two and four against the defendant in response to the crack cocaine that the police had discovered in the ceiling of the apartment. The state brought the first and third counts against the defendant in response to allegations by the police that they later discovered crack and powder cocaine in the tan Oldsmobile parked across the street from the apartment.

On April 11, 2000, the jury returned a verdict of guilty as to counts two and four, and not guilty as to counts one and three. The court accepted the verdict and rendered judgment accordingly. The defendant later was sentenced to a total effective term of eighteen years imprisonment. This appeal followed. Additional facts and procedural history will be presented as necessary.

I

The defendant claims that the evidence was insufficient to support his conviction and, therefore, the court improperly denied his motion for a judgment of acquittal. Specifically, the defendant argues that the evidence was insufficient to support a finding that he had possessed the crack cocaine seized from his apartment. In

furtherance of that argument, the defendant claims that the state did not prove that he had known that crack cocaine was present in the apartment and that he had exercised dominion and control over it. Additionally, the defendant claims that the evidence was insufficient because none of the witnesses presented at his trial had seen him place the crack cocaine in, or retrieve it from, the ceiling.

"In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 224–25, 733 A.2d 156 (1999).

"In order to prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its pres-

ence and exercised dominion and control over it. . . . Where, as here, the cocaine was not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. . . . One factor that may be considered in determining whether a defendant is in constructive possession of narcotics is whether he is in possession of the premises where the narcotics are found. . . . Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference." (Citations omitted; internal quotation marks omitted.) Id., 225.

In the present case, the state did not claim that the defendant was in exclusive possession of the apartment where the crack cocaine was found. Consequently, the jury could not have reasonably concluded that the defendant had constructively possessed the crack cocaine, namely, that he had known of its presence and had control over it, "unless there [were] other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) Id. We conclude that there were other incriminating circumstances from which the jury reasonably could have concluded that the defendant had constructively possessed the cocaine.

During the trial, the state called Domingo Toro, the superintendent of the apartment building, as a witness. Toro testified that in the month preceding the raid, the defendant leased the apartment and paid $800 for rent and a security deposit. The state also introduced a utility bill for the apartment, which was in the defendant's name, and other evidence indicating that the defendant had requested electric service one week before the

search. Kluntz testified that he had seized a key from the defendant while searching him and, using that key, had unlocked the door to the apartment. Also, evidence indicated that the defendant was in the apartment shortly before and during the search, and that the officers had observed him running from the front bedroom, where the crack cocaine later was found, moments after they had forced entry into the apartment. The defendant told the officers that his clothing was in the front bedroom and that the front bedroom was his. The defendant's social security card and alien registration card were found on the kitchen counter within inches of a sheet of paper listing drug sales. Michael Gugliotti, a sergeant in the Waterbury police department, testified that the other items found on the kitchen counter, i.e., the metal pot containing cocaine residue, the plastic bags, the opened boxes of baking soda, the paper towels and the strainer, were "consistent with an individual that would convert a powder cocaine into crack cocaine."

Construing that evidence in the light most favorable to sustaining the verdict, the jury reasonably could have found that the crack cocaine that the police had found in the ceiling of the defendant's bedroom had been manufactured in the kitchen. Also, the jury reasonably could have inferred from the location of the defendant's social security card and alien registration card that the defendant had been involved in the manufacturing process. Those findings tend to buttress an inference by the jury that the defendant knew of, and had control over, the crack cocaine. We conclude that the evidence was adequate to support a finding that the defendant had constructively possessed the crack cocaine and, thus, the court properly denied the defendant's motion for a judgment of acquittal.

## II

Next, the defendant claims that the court improperly declined to sever his trial from that of his codefendant,

Polanco. In support of his claim, the defendant makes two assertions: (1) during the hearing on his motion to sever, he established that his defense and Polanco's defense were antagonistic and, therefore, the court improperly denied his motion to sever; and (2) as the joint trial progressed, he was substantially prejudiced when the court admitted certain evidence that would not have been admissible at his trial had he been tried separately. We reject the defendant's claims.

The standard of review of a court's decision to deny a motion to sever is well settled. "[W]hether to consolidate or sever the trials of defendants involved in the same criminal incident lies within the sound discretion of the trial court. . . . Ordinarily justice is better subserved where parties are tried together. . . . Joint trials of persons jointly indicted or informed against are the rule, and separate trials the exception resting in the discretion of the court. . . . A separate trial will be ordered where the defenses of the accused are antagonistic, or evidence will be introduced against one which will not be admissible against others, and it clearly appears that a joint trial will probably be prejudicial to the rights of one or more of the accused. . . . [T]he phrase prejudicial to the rights of the [accused] means something more than that a joint trial will probably be less advantageous to the accused than separate trials." (Internal quotation marks omitted.) *State* v. *Booth,* 250 Conn. 611, 620, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut,* 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

## A

We first review the court's decision to deny the defendant's motion for severance. In so doing, we are mindful that our review must be based solely on the information provided to the court at the time the motion was considered. See id., 620–21; see also *State* v. *Smith,* 201 Conn.

659, 669, 519 A.2d 26 (1986) ("[t]he discretion of the court is necessarily exercised before the trial begins and with reference to the situation as it then appears to the court"). "The test for the trial court is whether substantial injustice is likely to result unless a separate trial be accorded." *State* v. *Booth*, supra, 250 Conn. 620.

The following procedural history is relevant. During voir dire, the defendant filed a motion to sever. During the hearing on that motion, the court engaged the defendant's counsel in the following colloquy:

"The Court: When you say that the defenses will be antagonistic, in what way do you mean they will be antagonistic?

"[Defense Counsel]: I can foresee a situation where—

"The Court: I don't want you to indicate what you can foresee. The joint trial is the rule, severance is the exception. The court has the discretion to sever the cases only upon a clear showing of manifest injustice, severe prejudice. You've moved for severance. . . . [I]t is your burden to show that those conditions exist which would warrant the severance.

"[Defense Counsel]: I agree with you, and the antagonistic defenses come into play because . . . if the drugs belong to anybody in that apartment and if they weren't his, they had to be the other person's. . . .

"The Court: Doesn't the case law say that the defenses have to be mutually exclusive? I haven't heard that; just the fact that one defendant points the finger at another does not create two mutually exclusive defenses. . . . Your client is simply saying that [the drugs] were not his and he didn't know how they got there. He can't even affirm that they ever were there.

"[Defense Counsel]: Right, but now he knows—

"The Court: He's not going to testify that [the drugs] were [Polanco's]. He's not going to testify that he saw [Polanco] put them there.

"[Defense Counsel]: He's not going to say that he saw Polanco put the narcotics there, no."

The court denied the defendant's motion to sever, finding that the defenses were not antagonistic. A few days later, as voir dire was continuing, the defendant renewed his motion to sever. As he did not present any new arguments, the court denied the renewed motion.

The court was correct in its determination that the defenses were not antagonistic. "When . . . the jury can reasonably accept the core of the defense offered by either defendant only if it rejects the core of the defense offered by his codefendant, the defenses are sufficiently antagonistic to mandate separate trials. . . . To compel severance the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. . . . Such compelling prejudice does not arise where the conflict concerns only minor or peripheral matters which are not at the core of the defense." (Citation omitted; internal quotation marks omitted.) Id., 621. Moreover, "[w]here proof of the charges against the defendants is dependent upon the same evidence and alleged acts . . . severance should not be granted except for the most cogent reasons." (Internal quotation marks omitted.) Id., 622.

In the present case, the defendant failed to offer any persuasive information to substantiate his claim of antagonistic defenses. "[I]t is the party's responsibility to present information to the court from which it can determine whether the defenses are going to be antagonistic . . . ." (Internal quotation marks omitted.) Id., 621. Furthermore, our Supreme Court has stated that mere assertions are insufficient to overcome the preference for a joint trial. See, e.g., id.; *State* v. *Varricchio*,

176 Conn. 445, 449–50, 408 A.2d 239 (1979) (defenses not antagonistic even though defendants asserted they were). On the basis of the record before the court when the defendant filed each of his motions to sever, we conclude that the court did not abuse its discretion in concluding, in both instances, that the defenses were not antagonistic.

Our analysis, however, does not end there. We also "scrutinize the strategies [actually] employed by each defendant at trial and determine, in light of the trial court's ongoing duty to monitor the fairness of the joint trial, whether conflict between the defendants tainted the proceeding."[4] *State* v. *Vinal*, 198 Conn. 644, 649, 504 A.2d 1364 (1986); see also *State* v. *Cavanaugh*, 23 Conn. App. 667, 676, 583 A.2d 1311 (1990), cert. denied, 220 Conn. 930, 598 A.2d 1100 (1991).

The record discloses that the defenses employed at trial were not antagonistic. Neither the defendant nor Polanco testified or called any witnesses. Each presented his defense through cross-examination of the state's witnesses and closing argument only. The defense strategies employed at trial were as follows: (1) the police investigation had been shoddy, (2) the credibility of the state's witnesses was suspect, (3) the police had not found any weapons or pagers in the apartment and those items were strongly associated with drug dealers, (4) any one of a number of various third parties, including a former lessee of the apartment, could have placed the drugs in the ceiling of the apartment and (5) neither the defendant nor Polanco had knowledge of the crack cocaine until the police discov-

---

[4] "This second inquiry is required because exceptional cases may arise where a motion for separate trials has been denied, but during or after the joint trial it appears that the joint trial is resulting or has resulted in substantial injustice to one or more of the accused. In such circumstances, justice to the prejudiced accused requires that he be afforded a new trial." (Internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 623.

ered it in the ceiling of the apartment. These defenses were not antagonistic. They were, in fact, compatible.

## B

Finally, we consider the defendant's argument that as the joint trial progressed, he was substantially prejudiced when the court admitted certain evidence that would not have been admissible at his trial had he been tried separately. Specifically, the defendant claims that the state presented evidence concerning Polanco's struggle with Jones and Polanco's use of an alias, and he argues that this evidence would have been inadmissible at his trial had the court severed his trial from Polanco's. The defendant claims that that evidence inculpated him by association and, thus, substantially prejudiced him. In response, the state contends, inter alia, that some of the arguments raised by the defendant do not warrant review because they were unpreserved or were not timely raised. We assume arguendo that the defendant's claims qualify for review and that the evidence he complains of would have been inadmissible at his trial had he been tried separately.

"Because a preliminary motion for separate trials obviously must be decided before the actual trial, the merits of the motion can be determined only on the basis of whether at that time it appears that injustice is likely to result unless separate trials are held. It is for this reason that in support of such a motion the court must be fully informed of any and all circumstances which indicate that justice to the parties requires separate trials. Even with a full disclosure, supplemented by inquiry from the court [i]n the exercise of a wise discretion . . . exceptional cases may arise where a motion for separate trials has been denied, but during or after the joint trial it appears that the joint trial is resulting or has resulted in substantial injustice to one or more of the accused. In such circumstances,

justice to the prejudiced accused requires that he be afforded a new trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Holup*, 167 Conn. 240, 245, 355 A.2d 119 (1974); accord *State* v. *Booth*, supra, 250 Conn. 623.

The following additional facts and procedural history are relevant to the defendant's claim. The state accused Polanco of interfering with a search in violation of General Statutes § 54-33d. During its case-in-chief, the state presented testimony tending to prove that Polanco ran directly into Jones and, on impact, began wrestling with him. Also, the state presented testimony indicating that Polanco was known also as "Rivera." In abiding by the parameters set by the court in an evidentiary ruling favorable to the defendant, neither the state nor any of its witnesses referred to the name Rivera as an "alias." Additionally, the state never argued that Polanco's use of the name Rivera constituted evidence of a guilty mind.

Following the close of evidence, the court declined to instruct the jury that it was entitled to infer from Polanco's use of the name "Rivera" that Polanco had a guilty conscience. While instructing the jury, the court included the following directions as a precaution: "There are two defendants in this trial. Although the defendants are being tried together, you must consider the case against each separately; that is, your findings in one case do not in and of themselves establish a basis for a similar finding in another case. Each defendant is to be considered as if he were on trial alone for the offense for which he is charged and stands accused. You will be required, therefore, to render a separate verdict for each defendant, and there is a separate information for each defendant, which you will have with you in the jury deliberation room.

"There are also several charges for each of the defendants, and each charge is contained in the information

for that defendant. Each charge charges the commission of a separate offense. For example, each defendant is charged with two counts of possession with the intent to sell. Each defendant is also charged with possession with intent to sell within 1500 feet of a school. You must decide each count separately, render a verdict on each count separately. The two counts of possession with intent to sell each relate to different factual allegations. Count one related to the alleged drugs found in the automobile, and count two relates to the drugs allegedly found in the apartment. And there are two companion charges of possession within 1500 feet of a school district, one for each of the possession charges. And, in addition, Mr. Polanco has a separate charge against him for interfering with the service of a warrant, which I will describe in more detail later. These cases have been joined for judicial efficiency, but you must consider them separately. You must consider each count separately and decide whether or not the state has proven each charge beyond a reasonable doubt.

"I remind you that during the course of the trial, evidence was admitted for you to consider in the case with respect to one defendant and not another. . . . Your verdict for each must be based solely upon the evidence that is admitted for your consideration with respect to that defendant or as otherwise limited by the court."

We recognize that the defendant must prove substantial prejudice to prevail on his claim and that "[i]t is not enough for the defendant to show that a joint trial was less advantageous than a separate trial would have been." (Internal quotation marks omitted.) *State* v. *Booth,* supra, 250 Conn. 633. Also, we acknowledge that "[t]he jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) Id., 626. Given the nature of the evidence the defendant complains of and

the court's thorough cautionary instructions, we conclude that the defendant has failed to prove that he was substantially prejudiced by the joinder of his trial with Polanco's.

The judgment is affirmed.

In this opinion the other judges concurred.