STATE OF CONNECTICUT *v.* MARQUIS JACKSON
(AC 22377)

STATE OF CONNECTICUT *v.* VERNON HORN
(AC 22378)

Dranginis, Flynn and McDonald, Js.

Argued May 7—officially released November 5, 2002

*Donald D. Dakers*, special public defender, for the appellant (defendant in the first case).

*Moira L. Buckley*, deputy assistant public defender, for the appellant (defendant in the second case).

*Rita M. Shair*, senior assistant state's attorney, with whom were *Michael Dearington*, state's attorney, and, on the brief, *Gary Nicholson*, senior assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. After a joint jury trial, the defendants, Marquis Jackson and Vernon Horn, appeal from their judgments of conviction. Jackson appeals from his conviction of one count of felony murder in violation of General Statutes § 53a-54c, three counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), two counts of attempt to commit robbery in the first degree in violation of General Statutes

§§ 53a-49 and 53a-134 (a) (2), one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2) and one count of carrying a pistol without a permit in violation of General Statutes § 29-35 (a).[1] Horn appeals from the conviction of one count of felony murder in violation of § 53a-54c, one count of assault in the first degree in violation of General Statutes § 53a-59, three counts of robbery in the first degree in violation of § 53a-134 (a) (2), two counts of attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (2), one count of conspiracy to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134 (a) (2), one count of burglary in the first degree in violation of General Statutes § 53a-101 (a) (2) and one count of carrying a pistol without a permit in violation of § 29-35 (a). On appeal, both defendants claim[2] that the trial court improperly (1) denied their *Batson*[3] challenge to the state's peremptory challenges to remove venirepersons, (2) refused to conduct a preliminary inquiry into charges of juror misconduct without first receiving an affidavit from the parties alleging the misconduct and (3) permitted the state to introduce into evidence the prior statement of a witness under the *Whelan* doctrine.[4] Horn also claims that the trial court improperly (1) failed to sever his case from Jackson's, (2) denied his motion to suppress certain eyewitness identification testimony and (3) failed to declare a mistrial, sua sponte, after the jury heard evidence of possible witness tampering. We affirm the judgments of the trial court.

---

[1] Jackson was found not guilty of assault in the first degree in violation of General Statutes § 53a-59 and burglary in the first degree in violation of General Statutes § 53a-101 (a) (2).

[2] Jackson also claimed that the evidence was insufficient to convict him of carrying a pistol without a permit. At oral argument, he withdrew this claim.

[3] *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[4] *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

The jury reasonably could have found the following facts. On January 24, 1999, at approximately 3.30 a.m., Jackson and Horn, along with Steven Brown,[5] entered the Dixwell Deli on Dixwell Avenue in New Haven, wearing masks and carrying handguns. As Horn entered the deli, he fired five or six shots from a nine millimeter pistol. One bullet struck Caprice Hardy, a customer, and killed him. A second bullet struck Abby Yousif, an owner of the deli, in the shoulder. Brown and Jackson followed Horn into the deli.

Jackson then went behind the counter and attempted to open the cash register. Horn and Brown went to the deli's back room where they found Vernon Butler, an off-duty employee, and Warren Henderson, a homeless man who helped out around the store. Butler was hit on his head with the butt of a gun, searched for money and taken to the front of the store by Horn to open the cash register. When Butler could not open the register, Jackson took the cash that Yousif had in his pockets. Butler's cellular telephone was also stolen. The telephone was subsequently used the day after the robbery by Marcus Pearson, who had obtained it from Horn.

During the course of the robbery, two customers, one of whom was Kendall Thompson, entered the deli. Upon entering, each individual was forced to the ground at gunpoint and ordered to turn over whatever money they possessed.

In the back room, Brown riffled through Henderson's pockets, looking for any money that he may have had. Finding no money on Henderson's person, Brown searched the cigar boxes in the back room to see if there was any cash hidden there. After searching the back room, Brown returned to the front of the deli, where Horn was shouting orders by the door and Jackson was still behind the counter near the cash register.

---

[5] Steven Brown pleaded guilty and testified as a witness for the state.

Upon hearing the sound of sirens, Jackson, Horn and Brown fled the scene.

The police processed the crime scene and found latent fingerprints on a cigar box in the back room. The prints matched Brown's fingerprints on file with the Bridgeport police department. When interviewed by the New Haven police, Brown admitted his participation in the January 24, 1999 robbery and identified Jackson and Horn as the other individuals involved. Jackson and Horn were arrested and tried jointly. Jackson was found guilty of eight of the ten counts on which he was charged and sentenced to a total effective sentence of forty-five years imprisonment. Horn was found guilty of all ten counts on which he was charged and sentenced to a total effective sentence of seventy years imprisonment. These appeals followed.

I

The defendants claim that the trial court improperly denied their *Batson* challenges to the state's peremptory strikes of venirepersons. We disagree.

The following additional facts are relevant to our resolution of this claim. Jury selection in this case began on March 8, 2000, and concluded on March 29, 2000, having proceeded for sixteen days. The state was allocated thirty-six peremptory challenges, of which it used twenty-two, and each defendant was allocated eighteen peremptory challenges. Nearly 150 individuals were examined on voir dire before twelve jurors and three alternates were selected. The trial jury, including the alternates, included one black male and three black females.

During the course of voir dire, the state exercised two of its peremptory challenges on black males, C and

J.[6] Each time, Jackson raised a *Batson* claim.[7] Following the state's race neutral explanation for using its challenge and the defendants' argument that the state's explanation was a pretext, the court denied the *Batson* claim and dismissed the venirepersons.

"In *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reasons at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venire person's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his . . . particular case was tainted by purposeful discrimination." (Citations omitted; internal quotation marks omit-

---

[6] We use initials for the venirepersons to protect their legitimate privacy interests. See *State* v. *Hodge*, 248 Conn. 207, 229 n.25, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999).

[7] Horn raised a *Batson* claim only in respect to the state's excusal of C.

ted.) *State* v. *Clark*, 62 Conn. App. 182, 197–98, 774 A.2d 183, aff'd, 260 Conn. 813, 801 A.2d 718 (2002).

"In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law. A court addressing this issue must keep in mind the fundamental principle that official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. . . . Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." (Internal quotation marks omitted.) *State* v. *Hinton*, 227 Conn. 301, 324, 630 A.2d 593 (1993).

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race . . .]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him . . . in a perfunctory manner . . . (3) prospective jurors of one race . . . were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race . . . as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the

peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race . . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *State* v. *Clark,* supra, 62 Conn. App. 198–200. With these basic precepts in mind, we review the defendants' claims.

## A

### Venireperson C

On the sixth day of jury selection, the state exercised a peremptory challenge to excuse C, a black male. In response to the defendants' *Batson* challenge, the state's attorney explained that he excused C because he had negative interactions with the New Haven police department and had frequented the deli where the crimes occurred on numerous occasions. The defendants claimed the state's race neutral response was pretextual, arguing that because C stated that he could be "fair and impartial for both the state and the defendants," he should be permitted to sit on the jury. Finding that the state's reasons were not pretextual, the court excused C from service on this case.

During voir dire, C stated that he had been arrested in New Haven for a domestic dispute that resulted in his receiving court mandated counseling. Additionally, C stated that he had been to the deli where these crimes occurred "maybe seven, eight times."

The defendants contend that the questions asked of C were dissimilar to the questions asked of other venirepersons and were actually motivated by his gender and race.

After a thorough review of the transcripts, the defendants' characterization that the questions asked to C differed from those asked to the remainder of the panel is incorrect. Each venireperson questioned by the state was asked about their contact with the criminal justice system and their knowledge of the deli and its surrounding areas. The state used a peremptory challenge for each venireperson who had negative police contact as an adult. Additionally, C was the only venireperson who had ever been inside the deli.

We conclude that the state's explanations for its use of a peremptory challenge on C were race neutral. As we previously indicated, the state claimed that it excused C because of his negative contact with the New Haven police department, where members of that department would be testifying for the state in this case, and the fact that he had been at the crime scene on several occasions. "Prosecutors commonly seek to exclude from juries all individuals, whatever their race, who have had negative encounters with the police because they fear that such people will be biased against the government. We decline to ascribe a racial animus to the state's excusal of a venireperson with an arrest record simply because that venireperson was black. We agree with courts in other jurisdictions that this concern constitutes a neutral ground for the state's exercise of a peremptory challenge to excuse a black venireperson." *State* v. *Smith*, 222 Conn. 1, 14, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). Similarly, an individual's familiarity with the crime scene is a race neutral reason to excuse a venireperson. See *State* v. *Hodge*, 248 Conn. 207, 234, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999); *State* v. *Hinton*, supra, 227 Conn. 328.

"Once the state met its burden of producing a race-neutral explanation, it was incumbent upon the defendant to persuade the trial court that the state's reasons were insufficient or pretextual." (Internal quotation marks omitted.) *State* v. *King*, 249 Conn. 645, 662, 735 A.2d 267 (1999). The defendants failed to meet that burden. The only argument that was made to contradict the state's race neutral justifications for excluding C was C's assurance that he would be impartial, despite the fact that he had negative experiences with the police and had been to the crime scene before. The state, however, is not required to rely on a venireperson's assurance that he will be impartial. "[A] prosecutor is

not bound to accept the venireperson's reassurances, but, rather, is entitled to rely on his or her own experience, judgment and intuition in such matters. See *State v. Hinton*, supra, 227 Conn. 326–27 ('[t]he fact that a prosecutor distrusts a juror or finds [the juror's] responses not to be credible [may] be a sufficiently race-neutral reason for using a peremptory challenge' . . .); *State* v. *Smith*, supra, 222 Conn. 14–15 ('[a] venireperson's assessment of his . . . own prejudices may be untrustworthy for a variety of reasons')." *State* v. *Hodge*, supra, 248 Conn. 231–32.

We note that when the *Batson* challenge was raised, seven jurors had been selected, two of whom were black. "As we previously have noted, the trial court, in assessing the validity of the state's proffered reasons, is entitled to take into account the extent to which the state has accepted minority venirepersons. . . . The waiving of a challenge when minority venirepersons were available for challenge, though it provides no insulation from judicial scrutiny, is a factor that can lend some support to a finding of race neutral challenges." (Citation omitted; internal quotation marks omitted.) Id., 260.

Horn raises the additional claim that the court improperly denied his *Batson* challenge without determining whether the state's explanation was pretextual. As we have found, the state's explanations were race neutral. Accordingly, this claim is without merit.

We conclude, therefore, that the court properly determined that the state had not excused C on account of his race.

B

Venireperson J

On the fifteenth day of jury selection, the state exercised a peremptory challenge as to J. In response to

Jackson's *Batson* objection, the state stated that J "had some relatives that had some general contact with New Haven police officers and had been involved in narcotics, and his relatives have been in court." To which the court stated, "I see no problem with that. I think he is entitled to his peremptory challenge." In response, Jackson argued: "I think that the only problem with that is that there are very few inner-city black men who have not had some kind of contact with police officers, and very few black families who have relatives or friends who have not had some contact with people who have not been arrested as opposed to a black family from Westport. They are not going to have the same contact." The court thereafter overruled Jackson's objection and dismissed J.

Jackson argues that the court failed to provide him with the opportunity to rebut the state's race neutral reasons for excusing J. We disagree. As the record details, Jackson put forth his argument that the state's explanations were insufficient, and the court rejected that argument.

As we previously stated, a venireperson's negative contact with the police constitutes a race neutral explanation for using a peremptory challenge. Here, J stated that he had pleaded guilty to a narcotics violation in New Haven and had relatives and friends who were involved in the criminal justice system. The court properly rejected Jackson's argument that the state's reasons were pretextual. "A court addressing this issue must keep in mind the fundamental principle that official action will not be held unconstitutional solely because it results in a racially disproportionate impact." (Internal quotation marks omitted.) *Hernandez* v. *New York*, 500 U.S. 352, 359–60, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). Jackson's argument to the court rested solely on the disproportionate impact that the race neutral explanations the state provided could have on inner-

city black males. However, "[p]roof of racially discrimi-natory intent or purpose is required to show a violation of the Equal Protection Clause." (Internal quotation marks omitted.) Id., 360. Accordingly, we conclude that the trial court was not clearly erroneous in concluding that the state's use of a peremptory challenge against J was not the result of racial discrimination.

## II

The defendants next claim that the trial court abused its discretion in refusing to conduct an immediate inquiry into charges of juror misconduct. We disagree.

The following additional facts are relevant for our resolution of this claim. On April 14, 2000, after Jackson testified and in the absence of the jury, Horn's counsel told the court that Tanesha Horn, Horn's sister, and Charmaine Spears, Horn's girlfriend, had told him that while they were outside during a court recess, "two jurors, the tall fellow, and the younger—I do not know exactly who she means—white female having a discus-sion on the side of the court. . . . Apparently they were discussing the case and she claims to have overheard a statement along the lines of one saying to the other, 'Well, [Jackson] must have taken the money. . . . He was stealing his money to pay the rent.' " Additionally, Horn's counsel also informed the court that the two women overheard the jurors referencing an incident concerning Horn three years earlier. While Horn's coun-sel was presenting these facts, female voices making fragmented and confused statements were heard in the courtroom.[8] At this time, both defendants moved for a mistrial. The court denied Jackson's motion and stated that it was "not going to take the representations of . . . this type of—if you want to make a motion, I

---

[8] The females' voices were heard saying, "[Jackson] was stealing the money," and "something happened with [Horn] about three years ago, I do not know what, it was the statement that I heard, [Horn] three years ago."

suggest you make it in writing with whatever appropriate legal and factual bases that you think supports whatever relief you are requesting and the court will take it up. Well, we are certainly not going to deal with it in this rather offhanded way."

Horn's counsel then asked the court to permit Tanesha Horn and Spears to be placed under oath and questioned regarding what they heard. The court denied the request, stating: "Absolutely not at this point, absolutely not. You all well know the sort of threshold that has to be reached before we start questioning anybody about this. And I would like to see . . . affidavits, whatever you want to proceed so that it's not going to prejudice whatever legal remedies you think are appropriate. So, no, I'm not going to do that. I'm not going to permit that now, not on the basis of this record as it exists right now." Thereupon, the jury was called into the courtroom, and the state proceeded to call two rebuttal witnesses. Before recessing, counsel for the defendants identified the two jurors by name.

On the next court date, April 17, 2000, Horn's counsel informed the court that he received a telephone call from Tanesha Horn, in which counsel felt that "neither party was of such certainty, especially after two days had gone by, that it warrants them or they felt comfortable making any kind of an affidavit." In withdrawing his motion for a mistrial, Horn's counsel stated that "based on those statements . . . I'm not going to pursue on behalf of [Horn] any type of claim. *I want to make that clear, for every reason I want to make it clear we are not claiming any juror misconduct on the basis of what may or may not have been heard or the snippets or portions of what may or may not have been heard on Friday.*" (Emphasis added.) Jackson's counsel also withdrew his motion for a mistrial.

On the date that the defendants were to be sentenced, June 2, 2000, Horn raised the same issue of juror miscon-

duct again and moved to have the court conduct an evidentiary hearing. In support of the motion, Horn's counsel presented an affidavit from Spears that stated that had she overheard the two jurors speaking about the case during a court recess. No additional information was set forth.

The state responded that it was suspicious that Spears was unable to find the time to swear out an affidavit before the jury reached a verdict, but did so once a guilty verdict had been rendered. The state also claimed that it would be prejudiced if the court entertained the motion because it had a witness available on April 17, 2000, who was no longer available to refute the claims made by Spears in her affidavit. The state informed the court that an individual from London, England, was outside of the courthouse during the recess on April 14, in the vicinity of the two jurors who were alleged to have been discussing the case, and "he heard absolutely no discussions between them . . . . He said it had never occurred." The potential witness, who gave this information to the state's attorney, stated that he would be available to testify on April 17, the date the court asked for affidavits from the defendants. By June, when Horn raised the issue a second time, however, the witness had returned to England.

When the court asked Jackson if he was a party to Horn's motion, Jackson's counsel stated: "No, I'm not. Only because the evidence really didn't—or the information did not come to me directly, and I am a third party to it. I'm aware of it and I am aware of the matter when it was put before the court on a previous time; however, we're not aware of that information, and I have no confirmation of that information."

In denying Horn's motion, the court stated: "Had the matter been raised when it was appropriate to raise it, first off, everyone's recollection would have been

fresher; secondly, the state would have had available this witness from out of the country; and thirdly, the court would have had a number of options, including seating alternate jurors if it turned out that this was something that had some credence to it. Of course, at this juncture, none of those options are available. But more important than that, in the court's view, the present record of this case, it is quite skeptical of the fact that this affidavit now is filed, seven weeks after the verdict has been returned, by persons who have a connection with [Horn,] claiming this juror misconduct. So on the present record, I find this claim to be without merit. The motion for [an] evidentiary hearing is denied."

The defendants contend that the trial court violated the mandates of *State* v. *Brown*, 235 Conn. 502, 668 A.2d 1288 (1995) (en banc), when it failed to conduct an immediate inquiry into allegations of juror misconduct. We are not persuaded.

"Our jurisprudence on the issue of the right to an impartial jury is well settled. Jury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . [T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . [Article first, § 8, and the sixth amendment require] that a criminal defendant be given a fair trial before an . . . unprejudiced jury . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Centeno*, 259 Conn. 75, 81, 787 A.2d 537 (2002).

In *State* v. *Brown*, supra, 235 Conn. 526, our Supreme Court exercised its supervisory power over the administration of justice to require a trial court to "conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel. Although the form and scope of such an inquiry lie within a trial court's discretion, the court must conduct some type of inquiry in response to allegations of jury misconduct. That form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto." Id.

"[A] trial court should consider the following factors in exercising its discretion as to the form and scope of a preliminary inquiry into allegations of jury misconduct: (1) the criminal defendant's substantial interest in his constitutional right to a trial before an impartial jury; (2) the risk of deprivation of the defendant's constitutional right to a trial before an impartial jury, which will vary with the seriousness and the credibility of the allegations of jury misconduct; and (3) the state's interests of, inter alia, jury impartiality, protecting jurors' privacy and maintaining public confidence in the jury system. . . .

"Any assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jury [bias or] misconduct will necessarily be fact specific. No one factor is determinative as to the proper form and scope of a proceeding. It is the trial court that must, in the exercise of its discretion,

weigh the relevant factors and determine the proper balance between them. . . . Consequently, the trial court has wide latitude in fashioning the proper response to allegations of juror bias. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion. . . . Although we recognize that trial [c]ourts face a delicate and complex task whenever they undertake to investigate reports of juror misconduct or bias . . . we nevertheless have reserved the right to find an abuse of discretion in the highly unusual case in which such an abuse has occurred. . . . Ultimately, however, [t]o succeed on a claim of [juror] bias [or misconduct] the defendant must raise his contention of bias [or misconduct] from the realm of speculation to the realm of fact. . . . Finally, when, as in this case, the trial court is in no way responsible for the alleged juror misconduct, the defendant bears the burden of proving that the misconduct actually occurred and resulted in actual prejudice." (Internal quotation marks omitted.) *State* v. *Sunderland*, 65 Conn. App. 584, 590–91, 782 A.2d 1269 (2001).

A

Applying these principles to this case, we conclude that the trial court properly conducted a preliminary inquiry when it asked counsel to submit an affidavit before proceeding to question witnesses.

The court was first presented with the issue of juror misconduct on April 14, 2000 when the defendants brought to the court's attention the possibility that two jurors were discussing the case during a break in the trial before it was presented to them. Fragmented statements by women in the courtroom accompanied this presentation.[9] Once given the information, the court

---

[9] See footnote 8.

ordered the defendants to put their claim in writing, accompanied by supporting affidavits and the requested relief so as to enable it to "understand with some clarity exactly what the defense was claiming; and moreover, to provide—use that motion and affidavit as a basis to conduct the preliminary inquiry that's required in *State v. Brown*, 235 Conn. 526." On the following court date, the defendants did not provide any of the information the court requested. Further, when Horn's counsel withdrew his motion, he stated: "*I want to make it clear we are not claiming any juror misconduct on the basis of what may or may not have been heard . . .* on Friday." (Emphasis added.) The court then went onto other issues before it, without objection from either side.

The defendants claim that the trial court abused its discretion when it did not "conduct an immediate inquiry into these allegations of juror misconduct." While *Brown* requires a trial court to conduct a preliminary inquiry whenever an allegation of juror misconduct is raised, the scope and form of that inquiry lies within the court's sound discretion. Nowhere in the language of *Brown* did our Supreme Court mandate that the calling of witnesses had to be immediate. The court was presented with an oral claim of juror misconduct on a Friday afternoon. Then, Horn's counsel stated that he "obtained that information within sixty seconds of coming to the bench," before he had any time to delve into the claim's authenticity and before he could clearly state his position. The court then put off any ruling until it had more information to make an informed decision. Without having a clear idea of what the defendants were claiming as juror misconduct, the court correctly postponed proceeding any further until that information was forthcoming. Requiring a defendant to articulate his claims in a manner so that a court can understand what is before it does not violate the dictates of *Brown*. The court gave the defendants the

opportunity to develop their claim of juror misconduct and they failed to do so. Instead, the defendants withdrew their motion, and Jackson did not contest Horn's counsel's assertion that "we are not claiming any juror misconduct." Without any information to confirm that juror misconduct occurred, the court did not abuse its discretion in acting as it did.

### B

The court was again presented with a claim of juror misconduct on June 2, 2000, the date the defendants were to be sentenced. While we recognize that Jackson did not join Horn's motion at this juncture, we review the claim as to both defendants because "a trial court must, when presented with any allegations of jury misconduct, conduct a preliminary inquiry, sua sponte if necessary, in order to assure itself that a defendant's constitutional right to a trial before an impartial jury has been fully protected." Id., 528. Consequently, because this was a joint trial, the court was required to assure itself, even though Jackson did not raise the issue, that Jackson's, as well as Horn's, constitutional rights were not violated by any alleged juror misconduct.

On June 2, 2000, seven weeks after initially raising the claim of juror misconduct and six weeks after the jury returned its verdict of guilty, Horn filed a motion for an evidentiary hearing, accompanied with an affidavit from Spears. The claim of juror misconduct raised on June 2 was based upon the alleged conversation between two jurors on April 14, during a break in the trial, allegedly overheard by Spears. Horn's counsel did not provide any explanation for the delay in filing the second motion or in obtaining the affidavit.

"Given [t]he state['s] . . . strong interest in the finality of judgments . . . and in protecting the privacy and integrity of jury deliberations . . . we conclude that,

if the defendant perceived the trial court's inquiry as inadequate, then he would have complained during the inquiry process instead of waiting until after the jury had reached a verdict. Cf. *State* v. *Mukhtaar*, [253 Conn. 280, 298, 750 A.2d 1059 (2000)] (defense counsel's failure to seek any additional questioning or investigation by the court, despite repeated opportunities to do so, belies the defendant's assertion on appeal regarding the inadequacy of the court's action)." (Citation omitted; internal quotation marks omitted.) *State* v. *Respass*, 256 Conn. 164, 192–93, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001).

As our Supreme Court stated in *Brown*, "[t]here may well be cases . . . in which a trial court will rightfully be persuaded, solely on the basis of the allegations before it and the preliminary inquiry of counsel on the record, that such allegations lack any merit." *State* v. *Brown*, supra, 235 Conn. 528. We are presented with such a case here. On April 17, 2000, defense counsel withdrew their motions for a mistrial and stated that there was no juror misconduct. Seven weeks later, Horn raised the same claim, supported by an affidavit from his girlfriend, Spears, without any explanation for the delay. The court already had conducted a preliminary inquiry, as was required by *Brown*, into the claim of juror misconduct on April 17.

As to Spears' June affidavit, Horn's counsel had in April disclaimed "any juror misconduct on the basis of what may or may not have been heard or the snippets or portions of what may or may not have been heard" by Spears. The credibility of Spears' affidavit, under the circumstances of this case, was such that we can conclude that the trial court did not abuse its discretion in denying Horn's June 2, 2000 motion for an evidentiary hearing.

## III

The defendants also claim on appeal that the trial court improperly permitted the state to introduce into evidence the prior statement of a witness under *State v. Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The defendants argue that the court improperly admitted the prior statement because it was not inconsistent with the testimony the witness provided on direct and cross-examination, as is required by *Whelan*. We disagree.

The following additional facts are required for our resolution of this claim. During the trial, the state called Kendall Thompson. Thompson testified that he walked into the deli on the morning of January 24, 1999, and had a gun put to his head, was ordered to the floor and had the dollar that he was carrying taken from him. In addition to the masked gunman pointing a gun to his head, Thompson also saw a second masked man behind the counter.

Two days after the robbery, detectives took Thompson to the New Haven police department to give a statement concerning the events that occurred at the Dixwell Deli on January 24, 1999. During the course of the statement, detectives showed Thompson a series of photographs of individuals and asked if any of the men in the photographs were the men he saw committing the robbery. Thompson identified the photographs of Jackson and Horn as the two gunmen at the deli.

On direct examination, Thompson stated that he selected the photograph of Horn because "the person had yellow eyes" and that "his eyes [were] yellow." In regard to the photograph that Thompson selected of Jackson, he stated that he did not see Jackson in the deli during the robbery and selected the photograph only because his eyes looked familiar.[10]

---

[10] The following colloquy took place between the state's attorney and Thompson:

On cross-examination by counsel for Horn, Thompson testified that he selected Horn's photograph because his eyes were yellow, not because he was involved in the robbery at the deli.[11] Thompson also testified on cross-examination by Jackson's counsel that he did not see Jackson in the deli at the time of the robbery.[12]

"Q. This person shown in state's exhibit eighty-six [the photograph of Jackson selected by Thompson on January 26, 1999, as one of the individuals involved in the robbery], did you see him in the deli the night of the robbery, sir?

"A. No.

"Q. You didn't?

"A. (Indicating no.)

"Q. Well, tell us why you picked out the picture when Detective Dease showed those groups of pictures on January 26th of 1999.

"A. Because I said his eyes looked familiar, his eyes look like."

[11] The following colloquy took place between Horn's counsel and Thompson:

"Q. Now, so I understand it, why did you pick out [the photograph of Horn]?

"A. Because his eyes was yellow.

* * *

"Q. Now, did you pick this photo out because this is the person that was there or did you pick this photo out because the person had yellow eyes?

"A. Because the person had yellow eyes.

"Q. So, when you picked this photo out, you were not saying that this person was the person that you saw at the crime, right?

"A. Yes.

"Q. You were?

"The Court: Wait a minute, were you saying it was the person at the crime or not?

"A. No, I'm saying that he had yellow eyes.

"Q. And so, really what you were doing when you were pointing out this photograph was indicating that this person had yellow eyes like the person—

"A. Yes.

"Q. —who had the gun to your head, right?

"A. Yes.

"Q. You were not using—you did not intend when you signed that 'KT' to pick this gentleman out and say that is the person who put the gun to my head on January 24, were you?

"A. No."

[12] The following colloquy took place between Jackson's counsel and Thompson:

"Q. Did you indicate that [the photograph of Jackson], you didn't see him in the deli?

On redirect examination, the state sought to introduce into evidence the statement that Thompson gave to the police on January 26, 1999, under *State* v. *Whelan,* supra, 200 Conn. 743, in which Thompson described the individuals he saw committing the robbery and identified Horn and Jackson from a photographic array. The state claimed that "[Thompson's] cross-examination by [Jackson's counsel] and by [Horn's counsel] is sufficiently contradictory to what he said in the statement with regard to his selection of the photograph of Mr. Horn [and his] selection of the photograph of Mr. Jackson . . . ." Counsel for both defendants claimed that the testimony that Thompson provided at trial did not contradict the statement he gave to the police. In commenting on Thompson's testimony, the court stated: "Mr. Thompson has given evidence which might lead the jury to believe that he only picked Mr. Horn's photograph because of the color of the eyes and he only picked out Mr. Jackson's photograph because he recognized him from prior dealings, that neither identification had anything to do with either gentleman being actual perpetrators of the crime, and the cross-examination elicited what might fairly be construed as that type of evidence. That's what the state is trying to rebut." The court, finding Thompson's trial testimony to be inconsistent with the statement he provided to the police, admitted a redacted version of Thompson's police statement into evidence.[13] The defendants challenge this finding on appeal.

"A. Yes.

"Q. Okay. So, you didn't see my client, Marquis Jackson, in the deli at the time of the robbery, am I correct?

"A. No.

"Q. I'm not correct?

"A. I didn't see him.

"Q. Okay. You didn't see him. Okay."

[13] The redacted statement, which encompassed three of the nine pages of the complete statement, was read into evidence by the state.

In *State* v. *Whelan*, supra, 200 Conn. 753, our Supreme Court adopted a rule allowing for the substantive use of prior written inconsistent statements in limited circumstances. "Section 8-5 (1) of the Connecticut Code of Evidence incorporates the rule of *State* v. *Whelan*, supra, [753], and implicitly incorporates the developments and clarifications of the *Whelan* rule that have occurred since *Whelan* was decided. . . . Section 8-5 provides in relevant part: The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial: (1) Prior inconsistent statement. A prior inconsistent statement of a witness, provided (A) the statement is in writing, (B) the statement is signed by the witness, and (C) the witness has personal knowledge of the contents of the statement. . . . [O]nce the proponent of a prior inconsistent statement has established that the statement satisfies the requirements of *Whelan*, that statement, like statements satisfying the requirements of other hearsay exceptions, is presumptively admissible. . . . The admissibility . . . of a prior inconsistent statement pursuant to *Whelan*, is a matter within the wide discretion of the trial court. . . . On appeal, the exercise of that discretion will not be disturbed except on a showing that it has been abused." (Citations omitted; internal quotation marks omitted.) *State* v. *Trotter*, 69 Conn. App. 1, 9–10, 793 A.2d 1172, cert. denied, 260 Conn. 932, 799 A.2d 297 (2002). "In reviewing a court's discretionary evidentiary rulings, we make every reasonable presumption in favor of upholding those rulings." *State* v. *Conde*, 67 Conn. App. 474, 495, 787 A.2d 571 (2001), cert. denied, 259 Conn. 927, 793 A.2d 251 (2002).

It is the defendants' contention that the statement given to the police was not inconsistent with the testimony that Thompson provided at trial.

"A statement is admissible as a prior inconsistent statement . . . only when the trial court is persuaded that, taking the testimony of the witness as a whole, the statements are in fact inconsistent. . . . Such a determination as to inconsistency lies within the discretionary authority of the trial court. . . . Inconsistencies may be shown not only by contradictory statements but also by omissions. In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . and the same principle governs the case of the forgetful witness. . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. Thus, inconsistencies may be found in changes in position and they may also be found in denial of recollection. . . . The trial court has considerable discretion to determine whether evasive answers are inconsistent with prior statements." (Citation omitted; internal quotation marks omitted.) *State* v. *Eaton*, 59 Conn. App. 252, 263, 755 A.2d 973, cert. denied, 254 Conn. 937, 761 A.2d 763 (2000).

Considering Thompson's testimony as a whole and its entire tenor, we conclude that the trial court did not abuse its discretion in admitting into evidence Thompson's statement to the police as a prior inconsistent statement under *Whelan*. The impression that Thompson's testimony would have left on the jury was clearly in conflict with the statement Thompson gave to the police. As the court correctly pointed out, Thompson's testimony could have led the jury to believe that he picked Jackson's photograph only because he recognized him from prior dealings and that he picked Horn's photograph only because of the color of his eyes, and

not because they were the perpetrators of the crimes charged. In fact, during cross-examination, Thompson admitted that he chose the photographs for reasons other than that those individuals were the ones that committed the robbery.[14] To the contrary, in the statement provided to the police, Thompson answered in the affirmative when asked whether he believed that it was Jackson who was behind the counter wearing a mask during the robbery.

We also note that the court did not admit Thompson's statement to the police in its entirety. Rather, the court admitted only three of the statement's nine pages, redacting the statement to include only those portions that were inconsistent with the testimony Thompson provided at trial. We conclude that the trial court did not abuse its discretion in finding that Thompson's testimony at trial was inconsistent with the statement he gave to the police on January 26, 1999. Accordingly, Thompson's statement was properly admitted into evidence as a prior inconsistent statement under *State* v. *Whelan*, 200 Conn. 753.

## IV

Horn claims that he was deprived of his "right[s] to a fair trial [and] to present a defense, and his right to cross-examine witnesses presented against him" because the "joinder of his case with that of his codefendant Jackson made it impossible for [him] to present [a] defense without the jury considering evidence that was presented only in Jackson's case." We disagree.

"[W]hether to consolidate or sever the trials of defendants involved in the same criminal incident lies within the sound discretion of the trial court. . . . Ordinarily justice is better subserved where parties are tried together. . . . Joint trials of persons jointly indicted or

---

[14] See footnotes 10 and 11.

informed against are the rule, and separate trials the exception resting in the discretion of the court. . . . A separate trial will be ordered where the defenses of the accused are antagonistic, or evidence will be introduced against one which will not be admissible against others, and it clearly appears that a joint trial will probably be prejudicial to the rights of one or more of the accused. . . . [T]he phrase prejudicial to the rights of the [accused] means something more than that a joint trial will probably be less advantageous to the accused than separate trials." (Internal quotation marks omitted.) *State* v. *Diaz*, 69 Conn. App. 187, 195, 793 A.2d 1204 (2002).

"A joint trial expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called to testify only once. . . . [W]here proof of the charges against the defendants is dependent upon the same evidence and alleged acts . . . severance should not be granted except for the most cogent reasons." (Citation omitted; internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 622, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

"The test for the trial court is whether substantial injustice is likely to result unless a separate trial be accorded. . . . [W]e will reverse a trial court's ruling on joinder only where the trial court commits an abuse of discretion that results in manifest prejudice to one or more of the defendants. . . . The discretion of the court is necessarily exercised before the trial begins and with reference to the situation as it then appears to the court. . . . Therefore, we must review the trial court's decisions . . . to deny the defendants' motion for severance based upon the evidence before the court

at the time of the motions." (Citations omitted; internal quotation marks omitted.) Id., 620–21.

## A

Applying this standard, we conclude that the court did not abuse its discretion in denying Horn's motion for severance. "[I]t is the party's responsibility to present information to the court from which it can determine whether the defenses are going to be antagonistic or the evidence will unduly prejudice either or both defendants." (Internal quotation marks omitted.) Id., 621. In articulating his reason for seeking separate trials, Horn's counsel stated, "I now *think* that there is a *chance,* in fact, that we could be stuck in a position where [Jackson's counsel] is speaking about a rub-off effect . . . . [W]e *don't know.*" (Emphasis added.) He did not specify how his client would be prejudiced, nor did he in fact state that his client would actually be prejudiced. Rather, he only speculated that there was a possibility that his client could be prejudiced if there was a joint trial. "[O]ur Supreme Court has stated that mere assertions are insufficient to overcome the preference for a joint trial." *State* v. *Diaz,* supra, 69 Conn. App. 197. Accordingly, without any information presented to the court that Horn would actually be prejudiced, we conclude that the trial court did not abuse its discretion in denying Horn's initial motion for severance.

## B

Horn also claims he was prejudiced by three incidents during the course of the joint trial: (1) Jackson's being cross-examined about his criminal history; (2) Jackson's testimony inculpating Horn and being inconsistent with his alibi witness; and (3) the testimony of Detective Petisia Adger as a rebuttal witness to impeach Jackson.

"[E]ven after concluding that there was no abuse of discretion in granting pretrial motions to join trials, an

appellate court must also consider whether, as the trial developed, the joinder of the trials resulted in substantial injustice to the defendants. . . . This second inquiry is required because exceptional cases may arise where a motion for separate trials has been denied, but during or after the joint trial it appears that the joint trial is resulting or has resulted in substantial injustice to one or more of the accused. In such circumstances, justice to the prejudiced accused requires that he be afforded a new trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 623.

Horn first claims that the introduction of Jackson's criminal history had a negative "rub-off effect" on him. We disagree.

"Cautionary instructions to the jury concerning what evidence may be considered against which defendant can often alleviate any potential prejudice. The spillover effect . . . usually is best avoided by precise instructions to the jury on the admissibility and proper uses of the evidence introduced by the government. . . . *United States* v. *Fortna*, [796 F.2d 724, 737 (5th Cir.), cert. denied, 479 U.S. 950, 107 S. Ct. 437, 93 L. Ed. 2d 386 (1986)]; see also *United States* v. *Hernandez*, [85 F.3d 1023, 1029–30 (2d Cir. 1996)] (rejecting claim of prejudicial spillover when trial court instructed the jury that it was required to consider the evidence against each defendant individually for each count); *United States* v. *Villegas*, [899 F.2d 1324, 1347–48 (2d Cir.) cert. denied, 498 U.S. 991, 111 S. Ct. 535, 112 L. Ed. 2d 545 (1990)] (finding no merit to claim of prejudicial spillover when trial court repeatedly stated the importance of considering each defendant separately . . .)." (Internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 631–32.

In this case, the court repeatedly instructed the jury that Jackson's testimony was only to be used in the

case against Jackson, and not against Horn. See *United States* v. *Diaz*, 176 F.3d 52 (2d Cir.), cert. denied sub nom. *Rivera* v. *United States*, 528 U.S. 875, 120 S. Ct. 181, 145 L. Ed. 2d 153 (1999). "The jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 626. Horn has presented nothing to suggest that the jury did not follow the court's instructions. In its verdict, the jury found Jackson guilty of eight of the ten charges, while Horn was found guilty of all ten charges, further illustrating that there was no spillover effect. See *United States* v. *LaSanta*, 978 F.2d 1300 (2d Cir. 1992). We conclude that the court's instructions alleviated any "spillover" effect that may have occurred when the jury heard of Jackson's criminal history.

Horn's claim that Jackson's testimony inculpated him and was inconsistent with his alibi witness is also without merit. After the state rested, the court instructed the jury that the evidence it was then going to hear would be coming from the defense. The court also instructed the jury that "unless I indicate to the contrary, the evidence is being offered—is being offered by both defendants, so it's applicable to both of their cases, and if that's not the situation as to a particular witness, I'll let you know that." Jackson and Horn then proceeded to call witnesses jointly on their behalf. Horn did not call any witnesses solely as to his case, and the only witnesses that testified solely in Jackson's case was Jackson himself. Subsequently, the state called Adger in rebuttal to Jackson's testimony. Horn did not cross-examine Jackson or Adger, stating that "he did not want the jury to adopt their testimony as evidence against him."

Zanetta Berryman had been called on behalf of both defendants. Berryman testified that Horn and Jackson met her at around 2 a.m. on the morning of January 24,

1999. Horn was driving, and the three proceeded to the Dixwell Deli, where both Horn and Jackson left the car briefly and returned together. She testified that Horn returned to the vehicle with soda, cigarettes and some condoms. Berryman testified that Horn was gone for approximately one minute, "time to run into" the deli. Jackson, according to Berryman, had been given a quarter to make a call on a nearby pay telephone before he left the car. Berryman also testified that she did not see Jackson enter the deli at that time because she did not "look back." Berryman testified the three then drove to Jackson's apartment, where Horn and Berryman were dropped off and they went to Jackson's room. Berryman was in the bathroom for fifteen minutes, during which she did not see or talk to Horn. When Berryman left the bathroom, she called downstairs for Horn and he replied after a delay. Berryman then telephoned Marcus Pearson to say that she would meet Pearson at the Dixwell Deli, where Horn had just seen Pearson. Berryman and Horn then walked the short distance to the deli where they encountered the police responding to the robbery and shooting.

Before Jackson later took the witness stand to testify on his own behalf, the court instructed the jury that his testimony applied only to the case against Jackson and was not to be used in the case against Horn. Jackson testified that on the night of the robbery, he was at the Alley Cat Club until it closed at around 2 a.m.. Upon leaving the club, Jackson stated that he and Horn drove through a diner parking lot but did not eat there. Jackson and Horn then drove to the West Hills section of New Haven and picked up Berryman. The three went to the Dixwell Deli, where Jackson went inside to get change for a dollar to make a telephone call to his girlfriend. Jackson denied receiving a quarter in the car to make a call but he later modified his testimony to say that he did not recall receiving money in the car to

use a pay telephone. Jackson also testified that he did not see Horn go into the deli, nor did he enter the store with Horn, but he assumed that Horn went into the deli. After Jackson attempted to make the call on a nearby pay telephone, he returned to the car and the three drove to Jackson's residence were Horn and Berryman exited the vehicle and Jackson drove to his mother's house. Jackson also testified on cross-examination that Horn told him later that he was at the store "when it happened, before it happened."

The state called Adger as a rebuttal witness in Jackson's case. Adger testified that when she interviewed Jackson, Jackson stated that he and Horn ate at the diner and were at the Dixwell Deli at 3:30 a.m., the time the crimes occurred, and Jackson did not get to his mother's house until after 4 a.m.

At no time did Jackson implicate Horn as a perpetrator in the crimes. Rather, he denied that he and Horn committed the robbery at the deli when he and Horn were there with Berryman waiting outside. Furthermore, as both Berryman and Jackson testified, Jackson, Horn and Berryman were together from 2 a.m. until after the deli robbery. "When . . . the jury can reasonably accept the core of the defense offered by either defendant only if it rejects the core of the defense offered by his codefendant, the defenses are sufficiently antagonistic to mandate separate trials. . . . To compel severance the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. . . . Such compelling prejudice does not arise where the conflict concerns only minor or peripheral matters which are not at the core of the defense." (Citation omitted; internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 621. In this case, the differences between Jackson's and Berryman's testimony do not rise to the level of creating an antagonistic defense. The essence of Jackson's testimony was that he was

with Horn and Berryman from around 2 a.m. until he dropped them off at his residence, then went to his mother's house. The essence of Berryman's testimony was that she was with Horn and Jackson from around 2 a.m. until Jackson dropped her and Horn off at Jackson's residence. We conclude, therefore, that the defenses were not " 'antagonistic to the point of being irreconcilable and mutually exclusive of the trial.' "; id.; and did not require severance.

Although Jackson's testimony concerning Horn's statement about his presence at the deli "when it happened, before it happened" was ambiguous, the statement could be construed as relating to Horn's presence at the deli before the robbery. Moreover, the trial court carefully instructed the jury that Jackson's testimony should not be considered against Horn.

Finally, the testimony of Adger, introduced by the state in rebuttal to Jackson's testimony, did not prejudice Horn. As we stated previously, the jury is presumed to follow the instructions of the court, and there is nothing to indicate that those instructions were not followed in this case. See id., 626. Here again, the court instructed the jury that the testimony of Jackson was only to be used in the case against Jackson. Prior to Adger's testimony, the court instructed the jury that "[t]his testimony is being offered by the state in rebuttal to the testimony that Mr. Jackson gave. As I indicated before, Mr. Jackson's testimony was being offered as to his case alone, so, therefore, this rebuttal evidence is likewise rebutting that case alone and should be considered for that limited purpose." Horn has not established that the jury failed to abide by these instructions. Consequently, we conclude that Horn has not suffered substantial injustice from this joint trial.

V

Horn also claims that the trial court improperly denied his motion to suppress the eyewitness identifica-

tion testimony of Regina Wolfinger, Shaquan Pallet and Steven Brown. It is Horn's contention that the court deprived him of his right to a fair trial by not considering whether the identifications were sufficiently reliable. We disagree.

Our Supreme Court has stated: "In determining whether identification procedures violate a defendant's due process rights, [t]he required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 553, 747 A.2d 487 (2000); *State* v. *Austin*, 244 Conn. 226, 246, 710 A.2d 732 (1998).

"Upon review of a trial court's denial of a motion to suppress, [t]he court's conclusions will not be disturbed unless they are legally and logically inconsistent with the facts. . . . [W]e will reverse the trial court's ruling [on evidence] only where there is abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error. . . . Because the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks

omitted.) *State* v. *Iannazzi*, 68 Conn. App. 456, 460, 791 A.2d 677 (2002). "To prevail on his claim, the defendant has the burden of showing that the trial court's determinations of suggestiveness and reliability both were incorrect." (Internal quotation marks omitted.) *State* v. *Davis*, 69 Conn. App. 717, 728, 796 A.2d 596, cert. granted on other grounds, 261 Conn. 904, 802 A.2d 854 (2002).

"An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . In the past, we have held that [t]he presentation of an array of several photographs to witnesses, including that of the suspect, does not constitute an impermissibly suggestive pretrial identification procedure in the absence of any unfairness or other impropriety in the conduct of the exhibit." (Citations omitted; internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 156, 665 A.2d 63 (1995). We review Horn's claims with these principles in mind.

A

Horn claims that his photograph was emphasized and distinguishable from the other seven photographs in the array that was presented to Wolfinger and that the court improperly substituted its opinion of whether Horn's photograph stood out from the others for that of Wolfinger's. We disagree.

The court held a hearing on Horn's motion to suppress Wolfinger's identification of him from an array of eight photographs presented to her on January 24, 1999. Wolfinger testified at the trial that she was outside the Dixwell Deli waiting for someone inside when she saw Horn and Jackson leave the store with ski masks on their heads. At the hearing, Detective Leroy Dease and Wolfinger testified. Dease testified that he put together the array based on the description of Horn

after Horn became a suspect. Dease testified he used the photographs of the other seven individuals after entering a description of Horn into a police computer, which printed out photographs of others with similar characteristics.

Wolfinger testified that she went with police detectives to the New Haven police department. While there, she was shown eight photographs. Wolfinger selected Horn's photograph as one of the individuals she saw at the deli on January 24, 1999.

It is Horn's contention that his photograph was suggestive because of his light skin color, and because his photograph had a light colored background and was clearer than the other photographs in the array. The trial court, however, found that "the skin tones are not so diverse—that the point here is the skin tones are not so diverse that Mr. Horn's picture essentially is highlighted, excluded, jumps out at the witness so that an identification may be based on its standout features as opposed to the witnesses recollection." Wolfinger also testified that she selected the photograph of Horn "pretty quickly" because he looked like the individual she saw exiting the deli, not because of the skin color of the individual shown in the photograph.

We have held that "[w]e see no reason why a suspect cannot be included in a photographic array with photographs of other individuals bearing a description similar to but not exactly the same as descriptions given by witnesses to the crimes." *State* v. *Banks*, 59 Conn. App. 112, 119–20, 755 A.2d 951, cert. denied, 254 Conn. 950, 762 A.2d 904 (2000). Accordingly, we conclude that the array presented to Wolfinger was not unnecessarily suggestive, given the fact that Wolfinger did not base her identification on Horn's skin color and because Horn was not the only individual in the array who was light-skinned.

Horn's claim that the clarity and background of his photograph, when compared to that of the others, was emphasized, is equally unpersuasive. "Differences in the size and color composition of photographs in and of themselves do not render an array . . . unnecessarily suggestive." (Internal quotation marks omitted.) *State v. Taylor*, 239 Conn. 481, 499, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997). Moreover, Wolfinger testified that the backgrounds of the photographs did not effect her decision.

There is no merit to Horn's claim that the court substituted its opinion for that of Wolfinger. Horn claims that "[d]espite the court's conclusion that [Wolfinger] did not choose the defendant's photograph based on the process of elimination . . . that is exactly what she did." This characterization of Wolfinger's testimony is simply incorrect. Wolfinger explicitly testified that she selected Horn's photograph because he looked like the individual she saw leaving the deli, not because of any process of elimination. Accordingly, the court correctly found that the array of photographs presented to Wolfinger was not unnecessarily suggestive and denied Horn's motion. We conclude that the identification procedure was not unnecessarily suggestive and reject Horn's claim that Wolfinger's identification should have been suppressed.

B

Horn also claims that the court improperly denied his motion to suppress the identification made by Pallet because (1) the first time that Pallet was shown an array, he did not give a statement or sign the photograph he selected, (2) the second time Pallet was shown an array, he had already seen a photograph of the defendant and the police told him to "do the right thing," and (3) the court required a showing of police misconduct. We will review each claim in turn.

The following additional facts are relevant to our resolution of this claim. Pallet testified at the trial that he worked with the victim on the morning of the murder. After work, Pallet and the victim shared a taxicab. The taxicab initially went to the Dixwell Deli, where the victim was dropped off shortly before 3:30 a.m. to purchase some cigarettes. Outside the deli, Pallet testified that he saw Jackson and Horn smoking "wet." After receiving a cigarette from Hardy, Pallet left in the taxicab. Hardy remained at the deli.

Pallet was first presented with an array while he was at a meeting with his probation officer. When shown the array, Pallet was asked if he recognized any of the individuals shown. He pushed three photographs to the side, one of Horn, one of Jackson and one of Hardy, the victim and Pallet's friend. When asked if the photographs he identified were of the individuals he saw at the deli, Pallet stated, "take it for what its worth." When asked to sign the photographs, however, Pallet refused because he "did not want to get involved."

It is Horn's claim that Pallet's act of moving the photographs to the side and not signing them does not constitute an identification. An identification is "an act of identifying." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993). That is precisely what Pallet did by pushing aside the three photographs when he was asked if any of the individuals shown were at the deli on January 24, 1999. Taking the circumstances as a whole, we fail to see how Pallet's actions did not constitute an identification. Further, Pallet testified that at the initial meeting with the police, he told the police who he saw at the deli on the night of the crimes. Accordingly, the court's conclusion that there was an identification was not an abuse of discretion.

Horn also claims that Pallet's identification should have been excluded because when he identified Horn

from the second array, he had already seen his photograph and because the police told Pallet to "do the right thing." Several weeks after Pallet's original identification, Pallet was arrested on unrelated charges and taken to the New Haven police station. While there, he was again questioned by Dease and shown an array. This time, Pallet selected and signed the photographs of Horn, Jackson and Hardy.

"Recurring photographs taint an identification procedure only when, in the context of the entire array, the recurrence unnecessarily emphasizes the defendant's photograph." (Internal quotation marks omitted.) *State v. Milner*, 206 Conn. 512, 535, 539 A.2d 80 (1988). Horn does not make any claim that the array presented to Pallet was itself unnecessarily suggestive. Rather, he claims that because Pallet was shown Horn's photograph in successive arrays, the identification process was unnecessarily suggestive. Accordingly, we reject this claim.

We conclude that Dease's comment to Pallet to "do the right thing" did not taint the accuracy of Pallet's identification. When Dease questioned Pallet, he sought to have Pallet view the array a second time and sign the photographs of the individuals he saw at the deli. In trying to convince Pallet to sign the photographs he selected, Dease asked him to think about his friend, the victim, and told him to "do the right thing." At no point, however, did Dease suggest which photograph Pallet should select. On the contrary, Pallet testified that he did not feel pressured to select any individual photograph and that Dease sought only to learn the truth. Accordingly, we also reject this claim.

It is also Horn's contention that the court required a showing of police misconduct before an identification would be suppressed. In denying Horn's motion, the court held that "in neither situation do I see this as

police misconduct that would be deemed suggestive so as to create an irreparable likelihood of misidentification." While we agree with Horn that "[s]uggest[iveness] can be created intentionally or unintentionally in many subtle ways"; *United States* v. *Wade*, 388 U.S. 218, 229, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); we fail to see where the court required an express finding of police misconduct before an identification could be suppressed. As we previously stated, an identification will be admissible unless there is first a showing that the procedure utilized by law enforcement was " 'unnecessarily suggestive.' " *State* v. *Davis*, supra, 69 Conn. App. 728. That is precisely the standard the court used in finding that Pallet's identification was not so tainted as to "create an irreparable likelihood of misidentification." Consequently, we conclude that Horn's claim is without merit.

C

Horn's final claim in regard to the suppression of identification testimony is that the trial court improperly denied his motion to suppress Brown's identification of him as Brown's accomplice in the robbery. Horn contends that his photograph was "highlighted" because he was the only one in the array of photographs that was depicted with braids and that Brown's intoxicated state at the time of the identification rendered it unreliable.

The following additional facts are relevant to this claim. Brown had known Horn as "Trey" prior to the robbery, having met him "two or three times" at parties. After his fingerprints were found at the robbery-murder scene, Brown was arrested at his mother's house in Bridgeport and transported to the New Haven police department. Several hours before he was taken to New Haven, Brown had smoked marijuana and drank alcohol. While at the police department, Brown admitted

that he was involved with "Trey" in the robbery that occurred at the Dixwell Deli. Subsequently, Brown was shown a series of photographs and was asked to pick out anyone who was with him when he robbed the deli on January 24, 1999. He selected Horn's photograph, stating that he was certain Horn was involved with him in the shooting and robbery. The trial court found that Brown identified Horn as his accomplice in the crime and that Brown had seen Horn on two or three occasions prior to January 24. The court further found that the array of photographs was not suggestive.

Horn claims that the array presented to Brown was unnecessarily suggestive because his photograph was the only one that depicted an individual with a cornrow hairstyle. We disagree.

We have stated that "[w]e see no reason why a suspect cannot be included in a photographic array with photographs of other individuals bearing a description similar to, but not exactly the same as, the description given by witnesses to the crimes. *This is especially true where, as here, the most prevalent physical difference between the individuals in the photographs and the witnesses' descriptions was the presence of a certain hairstyle, which can easily change.*" (Emphasis added.) *State* v. *Salmon*, 66 Conn. App. 131, 139–40, 783 A.2d 1193 (2001), cert. denied, 259 Conn. 908, 789 A.2d 997 (2002). While Horn's hairstyle was not identical to the individual's shown in the seven other photographs, the array contained photographs of eight individuals who had similar facial characteristics. This fact Horn does not contest. We have previously noted that an argument could be made that a photograph is singled out where one has one hairstyle, while the remaining photographs had a different hairstyle. Id., 139. That, however, is not the case here. The array does not contain a photograph of Horn with braids and seven other photographs showing individuals with a hairstyle simi-

lar to each other, but different from that of Horn. The other seven photographs in the array contained individuals with differing hairstyles, negating the possibility that Horn's photograph would have been unduly emphasized because of hairstyle.

Further, the cases on which Horn relies are inapposite. In *State* v. *Small*, 1 Conn. App. 584, 588, 474 A.2d 460 (1984), we found that an array of photographs was impermissibly suggestive where four of the photographs could have been eliminated because of the age and weight of the individuals shown and three of the remaining photographs could have been eliminated because each contained a name other than "Pete" or "Peter," which the witness had been told was the assailant's name, leaving only the single photograph of the defendant. Unlike the situation in *Small*, where the most prevalent physical characteristic that resulted in a finding that the array was suggestive was age and weight, characteristics that are not easily altered, in the present case, the characteristic that Horn claims tainted his array, his hairstyle, can easily, and quickly, be changed.

Similarly, in *State* v. *Gold*, 180 Conn. 619, 655, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980), our Supreme Court found an array of photographs to be impermissibly suggestive when the array contained ten photographs of white males with bushy mustaches, with only the defendant's mustache being drawn in. The altering of the photograph in *Gold* made the defendant's photograph stand out. The array presented to Brown, however, did not contain any photographs that were altered.

It should also be noted that in both *Small* and *Gold*, the identifications were held to be admissible notwithstanding the suggestive nature of the arrays because they were determined to be reliable. In this case, we

conclude, on the facts found by the trial court, that Brown's identification was reliable.

"[R]eliability is the linchpin in determining the admissibility of the identification testimony . . . . To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [witness] to view the criminal at the time of the crime . . . the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) *State* v. *Salmon*, supra, 66 Conn. App. 136.

Balancing these factors in this case, Brown's identification was sufficiently reliable. As an accomplice in the crimes, Brown had ample opportunity to view and know Horn before, during and after the crimes; Brown was certain that Horn was one of his confederates and the lapse of approximately ten weeks between the date of the crime and Brown's identification was not of such a great length that would affect the accuracy of the identification. We therefore conclude that Brown's identification was properly admitted into evidence.

Brown's testimony that he had alcohol and marijuana prior to making the identification of Horn does not negate the admissibility of the identification. The manner of an identification goes to the weight of the evidence, not to its admissibility. *State* v. *Ledbetter*, 185 Conn. 607, 615, 441 A.2d 595 (1981) (referencing *People* v. *Taylor*, 123 Ill. App. 2d 430, 436, 258 N.E.2d 823 [1970], in which the court stated that "identification made by victim intoxicated at time of robbery admissible because manner of identification applies only to weight of evidence and not to admissibility"). "The weaknesses of identifications can be explored on cross-examination

and during counsel's final arguments to the jury. . . . The exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect. . . . Absent a very substantial likelihood of irreparable misidentification, [w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 252 Conn. 556.

This is not such a case were the circumstances surrounding Brown's identification created a "very substantial likelihood of irreparable misidentification." Brown pleaded guilty to being involved in the crimes that occurred at the deli, and he knew who was with him at that time. He testified that he was certain that Horn was there and that the alcohol and marijuana that he had prior to making the identification did not interfere with his ability to make the identification. Consequently, the court properly permitted Brown's identification to be admitted into evidence, and it was for the jury to determine how much weight, if any, to give to his testimony.

## VI

Horn's final claim is that he was deprived of a fair trial because the trial court did not declare a mistrial, sua sponte, after the jury heard evidence of possible witness tampering. This claim is without merit.

During direct examination by the state, Pallet was shown a letter that he had written. When offered as a full exhibit by the state, neither defense attorney objected. The state then proceeded to read the contents of the letter into evidence. In the letter, Pallet recanted

the testimony that he gave at the probable cause hearing identifying Jackson as one of the three individuals he had seen at the deli immediately prior to the murder and robbery. Rather, the letter stated that Pallet had not seen Jackson at the scene and had testified to that effect only because "a lot of people told that [Jackson] was one of the guys that had something to do with my friend, Caprice Hardy, being murdered." Pallet testified that he wrote the letter while he was in jail after somebody slipped a note under his cell door telling him to write it. Whereupon Jackson's attorney objected and asked for the jury to be excused.

Outside the presence of the jury, Jackson's counsel argued that Pallet's letter should not have been admitted into evidence because the note that induced Pallet to write it had not been introduced into evidence. Counsel suggested that the proper remedy would be for the court to strike the state's reading of the Pallet letter from evidence and give a curative instruction to the jury to disregard it. The court ruled in Jackson's favor and instructed the jury that "[t]he note . . . that was read to you just before the recess that Mr. Pallet gave testimony about and why he wrote it and the contents of that note, I'm striking from this case and you should not—disregard it and do not pay any attention to it whatsoever during your deliberations in this matter." At no point did Horn's counsel object to the introduction of the letter, nor to the testimony that followed.

Not having preserved the claim at trial, Horn now seeks to have it reviewed under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine.

"Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the

claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two steps in the *Golding* analysis address the reviewability of the claim, while the last two steps involve the merits of the claim. . . . The appellate tribunal is free . . . to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Solman*, 67 Conn. App. 235, 238, 786 A.2d 1184 (2001), cert. denied, 259 Conn. 917, 791 A.2d 568 (2002).

Horn's claim fails to satisfy the third prong of *Golding* analysis because he is unable to establish that he was clearly deprived of a fair trial by the admission of Pallet's letter.

After the court struck that portion of the evidence relating to Pallet's letter, it instructed the jury that it was not to consider the letter's contents or Pallet's testimony about it. As we previously stated, "[t]he jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary." (Internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 626. Horn has not offered any evidence to indicate that the jury failed to follow the court's instructions to disregard the evidence regarding the letter. It should also be emphasized that the note that Pallet received did not implicate Horn in any way, nor did Horn object to the introduction of Pallet's letter or at any time request that it should have been stricken from the evidence. Accordingly, we conclude that Horn has failed to establish that he was clearly deprived of a fair trial.

The defendant also seeks review under the plain error doctrine. "It is . . . well established that plain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *State* v. *J. R.*, 69 Conn. App. 767, 778, 797 A.2d 560, cert. denied, 260 Conn. 935, 802 A.2d 89 (2002). As we concluded earlier, Horn was not deprived of a fair trial when the court did not, sua sponte, order a mistrial when the jury heard testimony, which was subsequently stricken, that Pallet wrote a letter recanting his identification of Jackson because he was given a note telling him to do so. Accordingly, plain error review is not warranted in this case.

The judgments are affirmed.

In this opinion the other judges concurred.